Francisco Antonio Colorado Cessa, Jose Trevino Morales, Eusebio Maldonado Hurton, and Fernando Garcia Solis. I think I've covered everyone. And first we have Mr. Dershowitz. Thank you, Mr. Mayor. First of all, I want to thank you for your support for accommodating me by the end of the week. I apologize for sitting and not showing you in time. Along with Mr. John Klein, who represented the Minister of Culture, and the Governor, conceding right from the beginning and at the end that the agents never found any cash transactions and drugs used by the horses. There was no evidence of that. Quote, I acknowledge this. Quote, quote, unquote. There was no evidence that drug money was used by Mr. Colorado. So the government used two theories to try to fill in those quite large gaps. The first was that before the conspiracy began in 2008, the Zetas, who are drug criminals, provided money to Mexican politicians to obtain contracts for Mr. Colorado's company, ADT, and the Zetas loaned money to ADT to buy machinery. All before the- Didn't the court say that the jury could not consider those two things? Absolutely. Absolutely. I was just getting to that, Your Honor. I'm sorry. Go ahead. I anticipated my point. I appreciate that. And so that can't be counted as evidence except for general issues of credibility. But once the conspiracy began in 2008, the money ADT earned and with which the horses were bought was all clean money, legitimately earned by backbreaking labor in cleaning up oil fields. But the government argued that because the new legitimately earned money derived indirectly from and was therefore commingled with old drug money, it must all be deemed drug money, even though the old pre-indictment money had all been spent, and not a single penny of it was in any ADT account once the conspiracy began. The government called this its punchbowl theory. So your theory, though, is that the punchbowl is a new punchbowl that came out in 2008, and we have to look in that punchbowl, not the old pre-2007 punchbowl. Your Honor, I'm happy to look in the same punchbowl as long as we look at the punch. The punch is new punch. The punch is new punch. It's been washed. It's been washed. And the government's analogy, of course, fails because when enough punch is put in a punchbowl, ultimately the punch, the gin dissipates or becomes de minimis. So I won't bother reading the court the punchbowl analogy because the court's obviously familiar with it. Most importantly, the indictment itself charges that the money spent on the horses must be, quote, proceeds of crime. And here it was legitimate earnings of a legitimate business, which the government claimed was helped years earlier by illegitimate money. But here all the pre-indictment money was spent. None of it ended up in the punchbowl from which the horses were bought. Taking the government's punchbowl to its logical conclusion, it would really cast doubt on many of America's great fortunes, from the Vanderbilts to the Rockefellers to several Internet startup companies. Many of those derived, at least in part, from the earlier unlawful activity of the founders. Original sin, Your Honors, may be good theology, but it's not good law because under the government's theory, the machines essentially would have all had to be thrown out. Everything that in any way was tainted by drug money could not be used to generate new legitimately earned money, and that certainly is not the law, Your Honor. What do we do with the three former co-conspirators alleged to say that your client was getting money? They're kind of vague representations, but they are some representations, and aren't they some evidence to support the jury's verdict when we must construe the evidence in the light favorable to the verdict? That's an excellent question, Your Honor, and the government answered it. In their closing argument, I quote, I want you to forget about the co-operators. I want you to pretend they never existed in this case. So the government itself clearly told the jury not to rely on the co-operators, and we must presume that the jury followed that instruction. Well, it's not an instruction. It's an argument. It's an argument. It's an argument of weakness, Your Honor. But the jury could consider that. It's in the record. Is that enough? Do you lose because of those statements? Your Honor, thank you for asking that question. The answer, I think, is no. If you look at each, and we don't have time to go over each of the co-operators' testimony, every one of them is vague. They don't specify times. They don't specify dates. They don't specify sources. So it's clear why the government told the jury not to do this, and when the government tells the jury not to do it, I think at the very least you must presume that the verdict was not based on that because the government's closing argument, the government's opening argument, the government's argument at sentencing all throughout was based on the two theories, the theory of number one. But if your argument is insufficiency of the evidence, it's not – this isn't an Irving Younger tape. This is a question of insufficiency of the evidence, not whether the government made a good argument. So if the evidence is there that supports the verdict, we can't overturn the verdict because we think the government's argument was poorly made. Your Honor, I don't think that's the case when the government puts forth theories of the case, and the theories themselves are deeply flawed. Here, for example, you get a situation. The government spends all of its time theory one, theory two, and the closing argument. Everything is theory one, theory two, and assume the court finds theory one and theory two unconstitutional or illegal or unlawful or not consistent with the laws of money laundering. And then they find a few little dribs and drabs of evidence that could conceivably support the verdict. It would be utterly – But see, that isn't what we have here. I mean, it would be true if the government, for example, charged the case in an unconstitutional fashion. That's a different case from saying there is evidence to support the verdict that was reached, that was legitimately in the case, but the government just made a bad closing argument. I don't see that as an insufficiency of the evidence-winning argument. Your Honor, it's not just in the closing argument. It's in the opening argument. It's in the instructions. It's in the closing argument. It's everything that was told to this jury was there are two essential theories. They said this was a – Okay, so tell me where in the record the court instructed the jury to ignore the witness. They did not. They did not tell them to ignore it. But the whole thrust of the argument is that we have these two theories. They're sophisticated theories. We ask you to buy these theories. And so I think if I can persuade the court that these theories are not well-founded in the law, at the very least we should be entitled to a new trial at which the government is instructed not to put forth those theories. And let's see if these cooperators have enough credibility to justify the verdict. It's utterly unfair to sustain a verdict on a theory that the government didn't rely on, even if you can find snippets of evidence in the record that might in another case justify that conclusion. That was not that case. This appeal is about this case, how this case was tried. This case was tried on those theories. But let me move to the commingling argument because that gives the court an opportunity to reverse the conviction, even if, Your Honors, think there might be a scintilla of evidence. I want to hear commingling, but I have one more question about that. Sure. It is your position, though, that these co-conspirators' testimonies are insufficient to sustain the verdict. That's right. So you're not conceding that they alone would be enough. Oh, no. No, no, no. Your position is that they're insufficient because some of them, they say, oh, I actually don't know at the end of their testimony, or they say it's all vague and it's hearsay and it doesn't say that they know anything really specific about it. Is that your position? That's our position. That's your first? That's our position, and it's compounded by the fact that the government essentially concedes that. And the court concedes it. The court says there was no evidence, no evidence that money was paid or used or that dirty money was used to buy the horses. So the court itself seems to have ignored or forgotten about those witnesses. So we have a double argument, insufficiency on its face, but because of the theory of the case, super scrutiny has to be paid to those witnesses because they were invited to be ignored. On commingling, was there a timely objection made to the charge? Oh, more than a timely objection, Your Honor. The entire conference was based on objection, objection, objection at every single point. Has any circuit ever said that this was a good instruction or a bad instruction? The best we can tell you, Your Honor, is that there are circuits that say it would be a good instruction in a proper case if the elements of the Washington case were added, which we cite in our brief, which says it is evidence, but it's evidence you can either accept. Right. It needs to be not in a command form, but in a you are the province of the jury, and the evidence is yours, and you can choose to say it's evidence or not. Absolutely. But, Your Honor, you don't have to reach that. It was absolutely improper to give a commingling instruction in this case. Why? There was no horizontal commingling. All there was was vertical commingling. Let me explain what I mean. There was no point in time where there was clean money and dirty money, and where my client, or any of the clients in this case, said to be or not to be a money launderer. Am I now going to commingle or am I not going to commingle? That Hamlet moment didn't occur in this case. What happened in this case is after the fact, the government came up with a presumptive commingling, with a kind of constructive commingling, and that didn't require a decision on the part of the defendant. As the result of that, you cannot infer anything from the fact that machinery that may have been bought with dirty money was used. There was no literal commingling. In other words, not a single penny of dirty money ever ended up in the ADT accounts. So there was never a moment of commingling which could lead to an inference. This is a unique case in that respect, and we know of no case that permitted a commingling instruction when there wasn't a commingling moment. It has to be a commingling moment after 2008. That's right, after 2008, and there was no commingling moment, and I think the government will concede that. I challenge the government to explain to the court how what happened here could give rise to an inference of an intention to hide on the commingling theory. It seemed to me that there was some sort of alternative argument which undermines your position that to the extent that he's under duress or being pressured, the fact that he's having this disheveled and under pressure and all of that, that makes it seem that he was doing the bidding or had agreed to do something. I don't see how that cuts in your favor. Okay, Your Honor, thank you again for asking that question. You have put your finger precisely on the issue. He was under pressure and duress. His choice was buy the horses or die. Now the question was, did he buy it with drug money? No. Because he was under pressure, what happened is he had to use his own money. He had to go into his ADT account. He had to use his own money, his own checking account. He had to borrow interest at 170% interest because he was going to die otherwise. That's not money laundering. That may be another crime. I want to make it very clear, Your Honor, we're not putting forth duress as a defense to what happened here. We're putting forth duress as an explanation for what happened here and why it wasn't money laundering. It may have been another crime, but it was not money laundering. If he spent his own money... Couldn't the jury say, well, if he'd spend his own money and go broke under duress, he'd also agree to spend the drug lord's money? That's speculation, Your Honor. That's speculation. There's no evidence that there is drug money. So he spent his own money. Remember, the other guy who refused to spend his own money died, was killed. And so he had this terrible, terrible choice he had to face. It's not a defense, but it's an explanation for how all these events occurred without there being any... Oh, I'm sorry, I see I only have two minutes. Can I ask you a question on how you're spending your time with Mr. Klein? Is he going to talk about the forfeiture procedure issue? Yes. Yes, forfeiture. All right, go ahead. Sorry I had to alert the court to that in the beginning. So the government's second theory is a very, very simple theory. There wasn't enough money in ADT to buy it, so speculatively he had to go elsewhere. The judge said, I don't recall anything other than a logical jump that it had to be drug money because there wasn't enough money in ADT to do it. But if you look at the testimony on which that's based, the expert witness said, I don't know whether or not the expenses included the $10 million for horses. If the expenses included the $10 million for horses, then there was enough money. So the expert witness on the other side's own testimony eliminates that theory, and that's why it wasn't... What about this issue of sort of fronting the horses, that he paid for 120 some odd horses but only owned 40? Well, that's consistent with the theory I've just put forward. That is, certainly he was allowed to own his own horses as long as he provided the Zetas with horses. Otherwise, he'd get killed. It's the duress theory that's not duress? Well, it's not the duress defense. It explains why he would have his own horses, why he'd use names. First of all, front names are always... Okay, but if it's not a defense that he's under duress, then he's participating in the conspiracy. I mean, I don't think you can sort of have this defense-ish thing, but it's not a defense. So, Your Honor, the Fuchs case makes it very clear, and I'll just read one sentence from it. To the extent that the government used proof of an ongoing 1957 violation to create an inference of an agreement to commit money laundering, we review the sufficiency of the evidence demonstrating that Fuchs and Gonzales violated 1957. In other words, if the government tries the case as they did this one, conspiracy to money laundering, but we're going to prove it through money laundering itself, then they have to prove the underlying crime of money laundering. Otherwise, Mr. Colorado's case is not a co-conspiracy. It's not enough that he sent horses down there, and maybe the effect of the horses being down there was to give him some horses, give them some horses that might provide them with a clean source of information. He has to have the knowledge and the intent. Your Honor, may I have one more minute? If not, I'll do it in rebuttal. For her question, yes. Okay. So, is it your position that buying the horses for the drug lords is not money laundering? Absolutely, and that's the instruction. That's what you're saying in answer to Judge Haynes' question. That's the instruction. The instruction is that it has to have been bought with the proceeds of drug money. It's an absolute defense. If he bought the horses with his own money, not drug money, and then gave it to them, even if. Now, you could have charged another conspiracy. It's not this conspiracy, Your Honor. Thank you very much. Thank you. Mr. Kline. May I please report? John Kline for Mr. Colorado. I want to talk quickly about two issues. One is the sentencing issue, and the other is the forfeiture issue. As for sentencing, the question there was the value of the funds laundered, and really that's, to a large extent, the issue you've been discussing with Mr. Dershowitz. We maintain that the government had to prove that these funds were proceeds at trial as well, but there's no question that to get the 20-level increase at sentencing, which added 17 years to Mr. Colorado's sentence, it was necessary to prove the value of the funds laundered, and it was necessary to prove that these were, in fact, proceeds. And for all the reasons that we've been discussing, there was not that evidence. And to talk for just one second about the three cooperators who did come up again at sentencing, we're talking here about three people. None had personal knowledge. What they all said is this is what 40 told me or this is what 42 told me. None of them could say that the money went into a particular account from which horses were later paid for. None of them could provide a date. It was the most vague sort of testimony imaginable. That, even at sentencing, that doesn't constitute reliable evidence, and it certainly shouldn't be enough to support a conviction. Okay. Now, on the issue of forfeiture, if we were to send it back for a new hearing, what's going to happen at this new hearing? The problem I have is I tend to agree with you the procedure wasn't followed. I'm having trouble figuring out, though, what difference that made. I mean, I'm a procedure person. I don't like to say, well, you know, it doesn't matter, this or that, but there is a harmless error standard. So my question is, where is there anything in the record that shows us what you all might have done had you had a hearing that we then can anticipate would happen in this hearing? I'll zero right in on it. The government predicated $50 million of this $60 million forfeiture on an agent's hearsay testimony about what an informant codenamed, although we knew his actual name, Patufo, supposedly told him. This agent was selected because he didn't know very much about Patufo. And, in fact, the government said right before the cross-examination that the agent had deliberately not read the reports by other agents who had interviewed or dealt with Patufo. So this was an agent who was put on because he didn't know. So what are you going to bring in about Patufo if we send it back for another hearing? What we're going to bring in, if you read the cross-examination that the defense lawyer tried to do at the hearing, did you know this about Patufo? Do you know this about Patufo? There was a whole series of things. I've got them here. He's earning $5,000 a month from the Mexican attorney general. He's testified in over 83 cases, many of which were reversed because of his lack of credibility. He gave a sworn declaration about Colorado and Mexico and never mentioned the $50 million. There's a whole— See, the judge said, I don't really, I can't spell Patufo. I'm relying on the trial. And, therefore, that's why I'm not giving you a hearing. And the judge, there is not any evidence in the trial record that would support a $60 million forfeiture. The only way— But he must have relied on the Patufo stuff. He had to have relied on Patufo. So you're going to bring in somebody new that does know all this stuff about Patufo? How are you going to present these credibility problems with Patufo? We would, I anticipate, both present our own affirmative evidence, proving up what the defense lawyer attempted to ask on cross-examination, and I would say destroying Patufo's credibility. And there may be other things we can do as well. I mean, Patufo was in the United States ready to testify at trial. We might be able to subpoena Patufo himself and cross-examine him on the stand. We might be able to subpoena, if not Patufo, at least an agent who knows something about the guy and who hasn't been deliberately walled off from any impeachment information. So it would be a meaningful hearing. This is not an empty gesture by any means. Can you call him? Is he around? Well, you'd have to ask the government that. But I know this. He was in Austin for the trial. And they had him waiting in the wings. Right, and the government didn't call him. But you could perhaps call him at the hearing. I think we probably could. And he's cooperating with the government. He's certainly within their reach. What kind of objections were made with regard to the money judgment? I mean, were you more concerned with the recusal motion or was there something? It seems to be some sort of confusion as to whether there was an objection to the money judgment or we were involved in a recusal matter. Well, there's sort of two phases. There's the actual sentencing hearing where the defense lawyer objected to considering the money judgment in that proceeding because there was a lack of notice and a lack of opportunity to deal with Patufo. And Judge Sparks said, basically, I get it. We're going to have a hearing. And then for some reason unexplained he turned around a couple of days later and just ordered the forfeiture. At that point, Mr. Colorado filed motions to recuse Judge Sparks to reopen the forfeiture hearing and so on. And those issues were more concerned with the recusal issue of Judge Sparks. But the objections that really mattered for this purpose are the ones that were made at the sentencing itself, and they were more than adequate. Were they objections to the procedure or were there some merit objections, arguments made with regard to the money judgment? Well, I would say both. They were objecting to the procedure because they said we've been waiting for a motion, we've been waiting for a preliminary order of forfeiture, and nothing's happened. That's the procedure, which should have happened. But then there were also the defense lawyer got up and said, after this sort of futile cross-examination of the agent who didn't know anything, the defense lawyer said, you know, if we get a hearing, which we asked for, we'll be prepared to put on the evidence that we'll do more than just ask questions that get I don't know as the answer. So I would say the objections were both procedural. We didn't get notice. We didn't have a preliminary order of forfeiture. We didn't have a motion, and substantive, in that give us a chance and we will seriously destroy Patufo's credibility. Okay. Do you all have anything else? Thank you. Thank you, Mr. Coyne. Mr. Martinez? Good afternoon, Your Honor. May it please the Honorable Court and fellow counsel, I would like to first make a few preliminary remarks. I would stress that my client was a renowned and legitimate horse trainer. There's no question about that. The clients he served, though may have been suspected in illegal activity, were definitely involved in the horse racing industry. It existed, and my client served them. Every meeting, every engagement my client had with those individuals involved the pursuit of his legitimate horse racing employment. They were always together talking about horse racing, and that the government's evidence consists primarily of mere presence and association and perhaps the money trail. How many years is your client going to accept structured cash payments for horse training from drug dealers and continue to claim he's not a part of the situation? This wasn't like a one-off kind of deal. I mean, this went on for a long time. He's getting paid in cash and structured transactions for years. Well, Your Honor, let me respond first by saying this. It wasn't quite ñ I mean, I understand there's evidence that they were structured payments, but one of the agents, Agent Williams, stressed that, and I'll quote him, it was structured but not hidden. And there was a Tyler Graham who said many times the payments were above, sometimes below $10,000. So it's not always clear that it was at least blatantly structured. I'm not denying that there was evidence that there was structured money. In addition to that, he didn't control the financial affairs of Huotron Homes where the money went to. That was controlled primarily by his brother, Jesse Huotron. Well, obviously the jury didn't believe that because they acquitted him. Well, Your Honor, I think there were other reasons that made my client's case that's unrelated to the sufficiency of why he was convicted. I think a lot might have had to do with the administrative extraneous that came in that were open at trial. That might have influenced the jury. The fact that he had probably a greater association with the clients in the horse racing industry than his brother did might have also affected it. Let me ask you this because it seems like there's a line there somewhere. I think you can, like, be a clerk at Kroger and accept a drug dealer's $100 bill for, you know, stakes and not be in violation of any sort of money laundering statute. But there comes a point at which you're just so involved in taking cash and so forth from an unknown drug dealer that it becomes a problem. Where would you draw that line? And where does your client fall in that line? Well, I guess there's two issues regarding the money. One is the actual amount, the substantial amount of money involved. The other is the potential for that structuring occurred here. Either way, in addition to the statements I made that he didn't control the account, I'm not saying he wasn't aware of some of it, the point I would make is this, that just because he receives the money for his services, the money wasn't as substantial as to key him off. Remember, Your Honor, the records showed he served a lot, he trained a lot of horses, and he charged high fees. He's in no different situation than, say, Tyler Graham. How much higher were his fees compared to everybody else? I mean, did he earn this money or was it extra money that he was not earning? I think the money was really consistent with the work that he did. That's right. Yes, sir. And I'll also emphasize this. A lot of the money that was analyzed that led to the conclusions of the structuring and the large amount was actually money from other legitimate businesses that were commingled in the Hewlett-Toronto Homes account. So when they say X and X went to my client, it's not always that clear. Clearly they trace some of it for some of these clients, but a lot of it came from the home building industry that his brother maintained and other businesses. So where is the line? If we were to write an opinion that you think would be accurate that would assist your client, what line would you be asking us to draw? Your Honor, I don't think the court can . . . I think the court can always say that receiving a large amount of payments . . . In cash. In cash from drug dealers is a factor or is of evidentiary value, but it never can say that that would be enough. So whether that exists or not . . . That might get some criminal defense lawyers in trouble, I would guess. That's right. I didn't want to say that. Wow. I'm sorry. That's always a possibility. That's correct. Not just lawyers, but Lamborghini salesmen, luxury home builders. I think that's a factor. So the economy is going to collapse if we draw the line too nearly. No, it won't, and you could draw the line, and there's nothing the court can stop the court from considering as evidentiary analysis in the threshold of sufficiency. But it's never going to be enough, in my opinion, because you have to show willful participation, and in this case, just receiving the money . . . And by the way, the payments were made by the clients. He can't control how they make the payments. He can't control . . . There's no evidence that he said, look, make your payments in $10,000 or less than $10,000. There's no direct evidence that would indicate he ever discussed that with them. Maybe you can make some inferences, but there's nothing in the record to really draw those inferences from. And that would be what I would say. So it's short. I would conclude, unless there's other questions, that it's really evidence of mere presence and association, large amounts of money that may be structured, which he has no control of, not just how the payments were made or the account from which they were made. And everything he did was consistent with his legitimate horse training business and the clients he served. Whether or not they were engaged in money laundering and used the horse industry for those purposes, my client was not aware and didn't participate in those decisions. Thank you. Thank you, Mr. Martinez. Ms. Friel. Quite outnumbered here today. It feels that way to them. It takes seven of them to take on one of you. Well, the facts are on our side. There you go. Good afternoon. I'm Jennifer Friel, and I represent the United States. The evidence in this case really was overwhelming, that the Zetas were laundering drug money in the United States, here in our backyard in Texas and Oklahoma, by purchasing, racing, breeding these quarter horses. And I want to start. All right, but I'd like you to help me with the line here, because I understand sufficiency of the evidence, so we make inferences in favor of the verdict and all that. But it does seem to me that you're announcing a rule with Mr. And I don't know how to pronounce it, Houtron, or we need my colleague here to pronounce it. Mr. H., you're saying that because he took drug dealers' money to give legitimate horse training, he's a money launderer. That seems like a rather – that's drawing the line to catch a lot of – I mean, it could catch Kroger. It can catch the Cadillac dealer or the Lamborghini, whoever. That's a lot. Your Honor, knowledge is key here. The fact that he knowingly agreed to further this scheme. But what did he do, other than accept large quantities of cash over a period of years that – he actually trained horses. Nobody's denying that. No one's denying that, Your Honor. Okay, so he's a legitimate horse trainer who trains horses and did so. Is it enough, then, that he accepts cash from let's call them unsavory people for purposes of this discussion? That's enough to make him a money launderer? That's your belief under the statute? Your Honor, it's the facts in total. It's the fact that he met personally in Mexico with Miguel Trevino, Zeta 40. He sat down with Zeta 40, one of the most violent men in the world, took his money. Okay, but you're not getting me any further from the – so Mr. Miguel Trevino, in your estimation, is an unsavory person. All right, I'll accept that for purposes of this discussion. Why does sitting down with him matter any more than taking the money from him unless you can prove that something happened at that sit down where the agreement was made? But if I'm sitting down, we're talking horses, I'm this great horse trainer, I can train for you, Mr. Trevino, whatever, and he hands over his cash and says, okay, train this horse. Why is that any different than Mr. Trevino walking in the Lamborghini dealership? The answer is he didn't accept the money from Miguel Trevino for horses registered to Miguel Trevino. He didn't enter these horses in these races as Miguel Trevino's horses. He perpetuated the scheme by allowing all the horses to be registered in other people's names, named in Caracasa's name, in Garcia's name. He took money knowing it was Zeta money but kept up with the fiction that there were legitimate owners. But he was a horse trainer. Now, what did he do to let these horses go under somebody else's name? He entered – he was very much involved in entering these horses in races. In fact, Tempting Dash, one of the most valuable horses, because Jose Villawitran was that trainer, he was in the picture in the winner's circle. He was the one who perpetuated this fiction that Jose Trevino was actually the owner of this animal. When the picture from the winning circle, Jose Trevino's son is holding up a 4 and a 0 for 40, and his daughter is holding up a 4 and a 2 for 42. You're perpetuating a fiction then. I mean, I don't think you can have it both ways. But, Your Honor, I understand. He knew he was getting money from somebody. And the key to – I mean, a lot of family businesses, dad is the money man, but he lets son and daughter run with it to give him something to do, and he's off doing something. So let's take a completely legitimate business like a house seller who lets his son and daughter go off and do the horse racing business, and he's the money man. But he wants them to have something to do, and they do that. I don't know that the fact that a different family member registers the horse to me necessarily indicates that Mr. H here is money laundering. I think all these facts together. It's not a good idea. If I were Mr. H's attorney in advance of this, I'd say don't be taking cash from drug dealers. So I'm not saying this is a good idea, but whether something's a good idea isn't the question when we're talking about a conviction under a specific statute. And conspiracies are tricky. You have the leader of the conspiracy, and as prosecutors we have to draw that line of how far down does it go. But the truth is this conspiracy would not have worked if there wasn't a horse trainer. It would not have worked if someone didn't train those horses and enter those horses into races. And Jose Villahuitlán took $500,000 in cash in two years. Why is that true, that it wouldn't work if they didn't train them? Because the horse that won the race, they retired it right away, so they don't care if they win races. It's not so much whether they win races. So I don't believe they need to have the best trainer in the world for the conspiracy to work. I don't see how that even works under the evidence that you presented. Well, if I may, the reason Tempting Dash makes hundreds of thousands of dollars off of breedings and inseminations is because of the winning record. If there's not a winning record, then there's not very good use as a stud. But I do accept that. Was any of that money that he was paid, did it somehow or other work its way back into the organization, or was that his money that he kept for him and his family? The evidence shows that that money stayed with him, that the cash stayed with him. There's no denying that, Your Honor. So he took money for training that you agree he did? Yes, Your Honor. And you don't have as part of your theory that he didn't really do some of the training? The evidence shows he was significantly paid for the work he did, that it was not a secret that the Zetas were involved in the horse business, that he knew that they were involved in the drug business. Do you have a case that says that's enough? We do have concert of action cases that a concert of action can show agreement. And the fact that he took huge cash delivery after huge cash delivery, structured that money, met with Miguel Trevino, and there's this evidence of the joke about a kilo. But he was upset about that, and I can see being upset. If you really think I am doing legitimate work for somebody who may or may not be a legitimate person, but I'm doing legitimate work for them and being paid for legitimate work, and now we're talking about kilos, I can see why you'd be upset. That seems to be sort of contrary to him being part of the conspiracy, that he gets upset and says, I don't want to hear anything about kilos, because I'm a guy just training horses. I'm not here taking drugs. Well, I think it just goes to the fact that he knew it was drug money. He knew he was in bed with this. But is that enough? He agreed to launder money. He knowingly entered the agreement. I think it comes from the fact that he's entering these horses in other people's names, concealing the true identity of the horse owner. Let me just be clear. If Mr. Trevino, number 40 or whatever, shows up at a Lamborghini dealership with, I don't know what a Lamborghini costs, let's say $400,000. I'm completely making it up because it's a little out of my pay scale. But anyway, shows up with $400,000, buys the Lamborghini, is the Lamborghini dealer who probably realizes, you know, this is a little weird, is that guy a money launderer? Under those facts, no, Your Honor. Okay, so what do we have to add? Savio Nieto never filed any paperwork about cash transactions. Okay, but you didn't go after him for that. Actually, you could have gone after him for that, but you didn't. Okay? You went after him for conspiracy and money launder, not failure to report receipt of cash in excess of $10,000, which I suspect has a much lower statutory maximum. So you go after him for the conspiracy, and you agree with me that simply taking money from a drug dealer to sell him some legitimate good or service isn't enough. What is the extra? What is the plus? It's the agreement to conceal. Okay, and we don't have any evidence of that but for the conduct that's consistent with regular okay business deals. You don't have any evidence. You keep saying, well, there's an agreement here, but every time you turn back that the agreement is the same thing that's the lawful conduct that you concede would be lawful apart from the agreement. So it circles. Your Honor, I do think that this conspiracy would have crumbled if there weren't men like Jose Villadran willing to take $500,000 in cash from the Zeta cartel and to introduce these. Houston Power and Light wouldn't give them light. They also wouldn't have the conspiracy. But, I mean, the fact that you need running water or electricity or whatever doesn't make all of these people who provide these services and goods part of your conspiracy. Yes, Your Honor, and the entering of the forces and the promoting this fiction that they were owned by other people and controlled by other people. Because I do think, seeing my time, I would like to move to some of the other issues, in particular the evidence against Colorado CESA because I think the record to some degree has been misconstrued as to what the theory of the case of the United States was. Let me ask you this, though, before you get on that. Mr. Dershowitz says, look, you tried the case on the wrong theory. So even if you have the evidence, you had the wrong theory, therefore I get a new trial. Answer that. Let's assume for the moment that you have sufficient evidence to convict Mr. CESA, but you made a terrible, not you personally, but your side, made a terrible closing argument and had a ridiculous theory. Does that warrant a new trial? No, Your Honor. Okay, why not? There's no case that would say that. And I also think that the closing argument's been taken completely out of context. The prosecutor might have been ineloquent, but essentially he was saying even if you take out the co-conspirator testimony, we still have proven our case. So we've sort of missed the fact that certainly no prosecutor is going to stand up and say to ignore evidence. We spent days putting on evidence and asking questions about this evidence. It might have been an artful, but the whole idea was even if you ignore this, you got this. It's not saying you must ignore this, please ignore these people I put on. It's more like even if you don't believe these three guys, I still win. That's kind of how I'm taking it. Your Honor, that's how I read the record as well. Assume the arguendo that what those three co-conspirators said is insufficient as a matter of law. Tell me what other evidence in the record supports your case against Mr. Colorado. Yes, Your Honor. I think the big picture here is the sheer amount of involvement of CESA and ADT. In the course of this conspiracy, he spent $10.1 million. He purchased 121 horses, and only 41 of those horses were registered in his name. So a full two-thirds. He bought horses and gave them to the Zetas. How is that money laundering? It is perpetuating the idea that Miguel Trevino was not the owner of these horses. No, you have to show that the money for the horses came from drugs. And where in the record, I have scoured this record looking for any evidence that the money that these horses were bought with came from drug money. And I haven't yet found it. I'm not saying I'm not going to find it, but I have not yet found it. I think you have to put these two things together. The fact that why would he spend $10.1 million of his own money buying horses that were put in other names? I'm scared to death he's going to be killed like the other guy was. Your Honor, the jury never heard that. That was raised for the first time on appeal. And the reason I proffer that it wasn't raised in the district court is because it would have knocked wide open the door for evidence that would. But that's why. So even assuming there's no reason why, they don't have to come forward and say why they're buying the horses. You have to show that the horses were bought with drug money. Yes. You concede that, right? You have to show that these horses were bought with drug money, right? Your Honor, yes, of course, as part of the agreement. Okay. Well, that wasn't what was—unfortunately, the counsel at trial made an objection during the closing argument that made that point, and the judge sustained the objection, which seems—because that is actually essential to this case, and that was an erroneous statement by the counsel, don't you think? Well, that's been taken a little bit out of context. What was said is—that's his closing argument. He said this check, you have to prove that this one check had drug money in it. You have to prove that some of the money came from drugs. But we didn't charge an individual account for that check. That's why that is a little bit out of context. Okay. Where does it show that some of the money came from drugs? Yes. I need those cooperators. I need those three. I mean— Okay. They don't say that any of this money came from drugs. Your Honor, they say that the whole reason this thing worked is because Miguel Trevino wanted to clean his money. He wanted to clean his money in the quarter horse racing industry, and he put it through ADT. He put it through ADT. He put it through Colorado CESA. Colorado CESA gave legitimacy. And I want to go back to the reason they— I don't concede that, Your Honor. The testimony— Other than them saying that this was the desire of the drug person, where in the record does it show any amount of money that actually went from one to the other on any particular transaction? Is there any evidence of any drug money going to Mr. Colorado, specific amount, date, any specific drug money? Your Honor, it's circumstantial evidence. You have the three cooperators. Is the answer no? Circumstantial evidence is still evidence. No, but is the answer that there is no specific evidence that any particular money from drug lords went to this Mr. Colorado? We do not have a date. We do not have a deposit that we can— You don't have any money that you can show went into his account? What we have is that— Is that correct? I'm going to tell you what we have. It's circumstantial evidence. Okay, but I want to know, is it true that you don't have any money? There was so much money going out of the ADT account. We have that IRS analysis that said the money coming in doesn't support the money going out. The only way that ADT was able to buy these 121 horses and spend $10.1 million was if drug money was also funneled through that account. But you don't have any evidence that drug money was funneled? We have three witnesses who said that it was, and I think to the— It didn't show up in your analysis of the accounts. I don't understand how I funnel money through an account, and you can't find it. We've got the cash deposits, Your Honor, but the— You don't know where they came from is what you're saying? Yes, Your Honor. Okay. And the UBS records, there's been a lot of criticism of the analysis— So were you able to match up at all between the testimony and the deposit? Like I saw Mr. X give Mr. Y $1,000, and then that day $1,000 was depositing? I wish we had something that concrete, but we don't. What we have is the witnesses who say this is how it worked. We also have the 404B evidence putting Cesar directly involved in the Zetas, that he was working with Efron Torres' Zeta 14, that he was buying horses back before this conspiracy started. This goes to his knowledge. And with regard to why he didn't raise a duress defense at trial, there was a significant amount of 404B evidence tying Cesar to the Zetas that the jury did not hear. They did not hear that he was moving cocaine on his tugboats, that he was moving cocaine in his jet, that there was a shootout between— Okay, so we can't consider that. We can't consider any of that if the jury couldn't consider it. Correct, but it was introduced at sentencing, and the fact that now on appeal we're trying to say an explanation, then if we're going to talk about the explanation, let's talk about why that explanation fails. Cesar is not Del Rio. Del Rio had his fingers broken. Del Rio had his face hit with assault rifles. Cesar's in bed with the Zetas. Cesar is the godfather of Efron Torres' son. He's knowing— And Torres is dead before this conspiracy ever starts. Correct, and the conspirators, co-conspirators, our witnesses said, and you know what, as soon as Torres is gone, Miguel Trevino says, Cesar, you work for me now. This is how it's going to work. The punchbowl theory is not our theory of the case. I want to make that clear. That was one witness making one analogy. Our theory of the case was that Cesar was in bed with the Zetas. ADT was a Zeta company. People said at the most Cesar owned 20 percent of this company, and that Miguel Trevino needed to clean his money, that Miguel Trevino needed a company to funnel that money through, and that is how he used ADT. So what is the circumstantial evidence? You seem to not have direct evidence. What is the circumstantial evidence that you're relying on? So we do have the fact that he spent $10.1 million, bought 121 horses, only 41 of them are in his name. Why would someone spend so much money? Because it's not their money. He spent Zeta money to buy the Zetas' horses. He wired $150,000 for breeding horses that were registered to Fernando Garcia, that was registered to Carlos Dian. ADT's account was just sort of a funneling piggy bank for the conspiracy. He would not have spent his own money for all of these things that weren't his unless, well, the evidence shows that it was, in fact, Zeta money. And when you put the conspiracy— What do we have to show that it's Zeta money that came into the company? The co-conspirator's testimony. Well, I'm looking at the co— Is there anything of the co-conspirator testimony that you would draw me to besides pages 4 through 6 of the reply brief of Colorado CESA where the co-conspirator's testimony is laid out? Is there additional co-conspirator testimony that you would point me to? Your Honor, I don't have the full record within me, but I could certainly provide the court with new record citations and a 28-J letter. But the fact is that— I don't see anything here that says that ADT is really owned by the Zetas and that all the money belongs to them and that there's no—I don't see that. The jury heard it, and a lot of that came from Geno Hossa, who was the accountant for Efran Torres, who testified about how ADT was started with Zeta money. Right. Started with Zeta money doesn't mean that it's really a Zeta company. But the evidence showed that over the course of time, that is how it operated, Your Honor. Where is that in the record? And I'd love to give specific citations, so if—rather than flip through the brief now and find my citations, I would love the opportunity to quote the record directly because I know that's what the court— I think it's very important to your case that you have some specific evidence that the ADT money that Mr. Colorado used came from the drug lords, and I don't really see that that's in the record that I've seen yet. Well, I think part of it is that it was consistent. We didn't have one witness up there who said this is how it worked. We had at least three, plus the 404B evidence, Hinojosa talking about the $180,000. So you do have multiple sources for that. In addition, you also have the fact that—I hear this a lot. People accuse witnesses of not knowing specific dates, but I actually think that lends credibility to our witnesses. Of course they don't know specific dates. We're talking about things that happened years ago. We're talking about a concert of action. We're talking about money, millions of dollars, and how it operated, the big picture. The co-conspirators were able to describe the big picture because that's what they remember. Let me ask you something about Jose. It just seems like your brief goes on and on about how he's the brother of these other— of these, again, for argument purposes, known drug dealers. I find that disturbing because, I mean, I don't think you're responsible for your brother. I mean, if my brother—I don't have a brother, but if I did and he were a drug dealer, I would not want to be, like, accused of because he's— So explain to me why, I mean, you put so much stock on that as if that is the deciding factor, and I'm offended by that, to be honest with you. To the extent that that was the impression, I apologize. That certainly was not the intent. His guilt comes through by his own behavior, not the behavior of his brother's, and I'm happy to highlight some of those facts if the court would like. Let me just— Sure. Your best facts for why, besides being the brother, if he was just Jose Smith, what would tie him? We had a witness who testified that he delivered $100,000 cash to Jose Trevino, identified Jose Trevino as the recipient of that cash, and delivered it a mile from Trevino's home in Balch Springs. Jose Trevino only made about $40,000 a year as a bricklayer. The most amount of money he ever had in his checking account was $8,000, yet all of a sudden he has a million dollars to buy a ranch in Oklahoma. When someone says, hey, this is a great ranch, how'd you get this money? He lied and said he sold a construction company. His records were a mess. The vet asked, hey, we need to list the owners. I can't tell who owns what horse. And Trevino's daughter said, yeah, we can start putting the owners on the vet records. And Jose Trevino says, no, no, no, don't put the owners on there. I mean, he was directly involved in the intent to conceal and to the extent— Didn't he just fall off the wagon? I mean, because there's evidence that he was not part of the brother's drug business and didn't want any part of it, and you're saying then all of a sudden he decided he did want in on the drug business? I think in his own mind, Your Honor, the way I read the evidence is he felt the horse business wasn't the drug business. Okay. So then is that intent to participate? He knew where the cash was coming from. But we've been down that road, knowing where the cash is coming from, in and up, even if it's your brother. Concealing, the concealment. The concealment. I would like to talk briefly about the commingling instruction. Good. It is a correct statement of the law. Show me where that's a correct statement of the law. I cite in the brief Rodriguez. I cite in the brief Wiley. None of those cases, while they say it can be evidence and the jury is allowed to consider it, none of those cases say that that would be appropriate as an instruction, that it is evidence. It's the province of the jury to decide if it's evidence or not. So do you have a case from any circuit or even any district court that would say that a jury instruction, that something is evidence, and then when you follow up with the second sentence about you can't let the defendants off if they do, it makes it even worse. Do you have any case whatsoever that says that supports this as a jury instruction? Your Honor, the D.C. Circuit in Braxton Brown v. Smith, which is cited in the brief, on plain error review. This isn't plain error review. I know. I'm being forthcoming with the court. The analysis is whether it's a correct statement of law. It's not. It could be evidence. It can be evidence. It's proper for the jury to consider it if it chooses to, but to tell the jury that it is evidence is not an accurate statement of the law, if you don't say the follow-up statement like was said in Washington. I do think may and fur would have been better language. Yes. May and fur is the right way to do this charge. Yes, Your Honor. And the government knew that blank how to do it. Why didn't the government do it right? Your Honor, I think just to cut to the chase, it was harmless. How is it harmless when it's the central issue in the case? It's not the central issue, if I may. The central issue is what we've been talking about is where was the source of the money? Was this? Xavier Huitron says, you know, I'm just an innocent horse trainer. I didn't know where the money was coming from. Colorado CESA says it was legitimate money. Intent to conceal, in fact, in the sufficiency of the evidence section of CESA's brief, he doesn't even address intent to conceal. The intent to conceal was overwhelming because of what I alluded to before, how these horses were registered. The whole case, the whole quarter horse industry lives and dies on AQHA, American Quarter Horse Association records. You're not going to get money for breeding. You're not going to get money for racing unless you have these records. And we had a witness say the records were incredibly difficult to follow. It was in alias names. It was in LLC names. Those AQHA records established intent to conceal. Intent to conceal simply was not the critical issue. The seminal case in Francis Free Franklin, it was the seminal case. It's a fair inference from having a mess that the mess is a concealment rather than just ineptitude. Oh, yes, Your Honor. And in addition, we also had the witness from the insurance company. These are million-dollar animals. They were insured. We had a witness say, I couldn't keep up. I'd get payments from. Was the insurance company also part of this conspiracy? No, Your Honor. Because they also knew the records were a mess, and they're enabling this by taking money for premiums on these horses. They weren't meeting with Miguel Trevino in Mexico. See, again, unless I know what happened at that meeting, I mean, meeting. I've met a lot of people in my life. I don't know that the fact that you meet somebody is by itself. in cash and agree to enter horses from the person giving you the money in somebody else's name in an LLC, unrelated. But, see, there again, I don't know that to me you've tried. We tried all of that. You've tried some of the others, but it seems like he's doing the training. I'm not clear that he's the one creating these LLCs and deciding that horse number one needs to be under so-and-so's name and so on. It didn't seem like he was the guy orchestrating that. Maybe I missed that. No, but a horse can't race. Admittedly, long record. A horse can't race unless there's a trainer there putting him in the race. Well, I don't know that. It's true. The record does establish that. And he perpetuated this fiction that Miguel Trevino wasn't the owner when he knew that Miguel Trevino was paying his bills and Miguel Trevino was the owner. Let me tell you, these American Quarter Horse Association, these racetracks would never have allowed a horse to race if Huichon was honest and said, Miguel Trevino is the owner. Well, let me ask you about the forfeiture because you're running out of time. It seems to me, how can you really defend completely failing to follow a procedure that's there and a $50 million? This isn't something where some Nuffenberger court cost was added or something like that. This is a $50 million of $60 million that gets put on there with no procedural following at all. I mean, really, can you defend that? I do think the procedure was followed in a lot of ways. The big issue with forfeiture is notice and the opportunity to be heard. And I listed in my brief all the times that the defendants were told that the United States was seeking a money judgment. On May 5th, on June 28th, on July 23rd, on October 5th, on December 4th. If I think there's going to be a trial and then all of a sudden there isn't one, there's a judgment against my client, I kind of would feel like, well, even though I was told that somebody wants a judgment against my client, I didn't ever get to find out there was a chance for me to come and talk. I mean, that's what's weird about this to me is, yeah, certainly I think they're on notice that there's some effort to get a forfeiture judgment, but there's a procedure laid out that I think counsel is entitled to assume will be followed until the judge says, I'm going to follow it, and then doesn't. Well, the rule requires that as soon as practical, a judge enter this preliminary order. And the parties agreed to resolve forfeiture at sentencing, and that's what was happening. Now, could the parties, could the government have telegraphed to the court better that, hey, we're deciding forfeiture issues at sentencing? The court said there would be a hearing. Yes, Your Honor. So you can't say that they agreed to this unorthodox proceeding. The court told them there would be a hearing. Yes, Your Honor. They relied upon that. Shouldn't we send the forfeiture back? The court didn't say there was going to be a hearing until after all the evidence had already been put forward. Right, but still— The United States proffered that, we've told you everything we're going to tell you, and in two motions— The rule says you get a hearing, and the court said you would get a hearing. Don't they get a hearing? They had a hearing. They had the sentencing hearing. So they had the hearing required by the rule, but I agree with Your Honor that the court said they'd have a second hearing, and that never happened. So shouldn't they get that hearing? I think that's when we get to the harmlessness. They had two opportunities. They filed a motion to withdraw and a motion to reconsider. Never made a proffer. Even in court today, they couldn't say how this would be different. Forfeiture shall be ordered. It is by law must be ordered with property involved in. Did the government put forward a person on purpose that didn't know about the questionable nature of the evidence that was being presented to kind of shelter the government witness so that they wouldn't know that the person had all of those previous cases where they were found to be unreliable and that they were on the payroll of the government of Mexico, et cetera? Your Honor, I find that accusation to be troubling, and that is not what happened in this case. Well, tell me what did happen then. Because that's a terrible accusation against the government, and I would like for you as the United States to tell me what really happened. Yes, Your Honor, and I find that to be troubling, and I know the prosecutor who called that witness, and it was not done anything to hide the ball. Colorado SESA intenuated at trial that he would take the stand. We had Patufo waiting in the wings as a rebuttal witness. Colorado SESA did not take the stand. Everyone had known about Patufo. He was on the witness list. This was not a surprise that this name comes up out of nowhere. The amount of paperwork that exists in Mexico and exists here, I don't think that witness felt comfortable saying he had reviewed everything and knew everything about this witness. I fully understood that that witness was the case agent and knew what he felt he needed to know to put forward this hearsay testimony and to put forward hearsay testimony that he believed fit within the record and fit within what we knew about Colorado SESA. Thank you, Ms. Friedman. Your Honors, I'd just like to correct the record in a couple of respects. We told our distinguished attorney, the Lone Ranger over there sitting alone, that the punch bowl was stated only during the testimony of one of the witnesses and that commingling is not the central issue. I think if Your Honors look at the closing, you'll see that in the closing itself the punch bowl is referred to. Commingling funds, you'll recall the example given to you by Agent Fernald, and that is the spike in the punch bowl because if you have the clean stuff and you put in the liquor in, then it's all commingled. And you'll see there's an extensive amount of time spent on commingling. Commingling is a central, central theory. We're seeing that on appeal here the government is backing away from a number of the arguments that relied on at trial. For example, our distinguished opponent said, and I quote her, I need these three witnesses. I need these three witnesses in the Court of Appeals. But at trial, I want you to forget about the cooperators. I want you to pretend they never existed in the case. We are getting a concession here, which is very important. The government conceded that the horses had to have been bought with drug money. The concealing element doesn't go to concealing the horses. It goes to concealing the drug money, the source of the drug money. And the government's theory easily could have been charging other crimes. They could have charged other theories and other crimes. But on appeal, they're stuck with the crime they charge. They charge it because they wanted the $60 million forfeiture. What happened to the bribe case with your client? The bribe case? He initially entered a plea of guilty. He has now moved to withdraw that plea of guilty. The withdrawal has not opposed by the government, but the court has not yet ruled on it. But if we send this back, we don't need to worry about the court it's in or any of that sort of thing, right? Nobody's trying to recuse anybody. Nobody thinks it should be in a different court. No one— Respond to that. You can take it now. And I'm not foreshadowing that we're sending it back, so don't. Wishful thinking, Your Honor. Judge Sparks recused himself. A different judge from a different district has been brought in, and there are several cases. There's a civil forfeiture case. There's the bribery case involving Mr. Colorado. And that judge, Judge Walter— If this goes back, it goes to the other judge? It will go to the other judge. Who's the other judge? Judge Walter from, I think, from the Eastern District of Louisiana, if I'm not mistaken. Why don't you finish? I just had one thing that I wanted to say about the forfeiture. Right before the cross-examination of Agent Lawson, who is the one who recounted what Patufo would say, the prosecutor—not my opponent here today, but the trial prosecutor— said the agent has not read any of the reports by other agents, and the cite for that is Record Cite 13-50849 at page 6145. There was a deliberate choice made for this agent not to read the materials that would have exposed him to the impediments. Is there any evidence in this record—I'm asking as an officer of this court— that the company was getting drug money? I'm not saying that—besides the time when it got the drug money, allegedly, the time that they supported the candidate in the election and they built—got some machinery or something— in any post-2008 evidence that this company was the drug lord's company and that it was getting drug money? Tell me as an officer of the court. The only evidence I know that could possibly support that inference is the government agent's testimony at trial about his examination of the records, which, as you all understand, we don't believe supports that inference at all. In other words, the agent— The evidence that the company didn't have enough money to be doing its business. Right. The money had to come from somewhere else. But that was wrong, of course, because he didn't take into account the possibility that the horse money was part of those expenses. The other evidence is one of the cooperators, one of the co-conspirators, says that— and I may be slightly misrecalling this, but I believe one of the cooperators says—it's quoted in our reply brief because we wanted you to see all of what those cooperators said. One of them said that 40 or 42 had told him that there was reimbursement to the company. That's it. As far as I know, that is all the evidence, post-2008 evidence on the record, that has anything to do—not to the account, not to—just to the company, and I believe that's it. Thank you. Mr. Gershowitz, you want to close up? Your Honor, if you have any questions, I'd be happy to respond to them. If not, I think the Court is completely familiar. It's such a pleasure to argue in front of a court that has read the record, knows the record very well. It makes both of our jobs easier, and so I just want to express appreciation to the court. If there are any other questions, I'd be happy to answer them. We would like an opportunity to respond to the letter that the government is filing because we think we can show also record sites that may point in the opposite direction. We think this record is barren of evidence that would justify not stretching the law of money laundering beyond any possible extent where it is, and I think Your Honor's questions pinpointed a lot of those very important issues. So, with appreciation, I thank the court. Farrell, you have an opportunity to tell us how good we are if you want. I'm just kidding. Okay. It's been a long enough day already. Thank you all. That was very good. We all know Judge Prado likes to make us laugh.  Do you want to take a break or . . .